CUYAHOGA METROPOLITAN HOUSING AUTHORITY, Plaintiff-Appellee,

v.

Richard M. HARMODY et al., Defendants-Appellants.

CUYAHOGA METROPOLITAN HOUSING AUTHORITY, Plaintiff-Appellee,

v.

CITY OF CLEVELAND et al., Defendants-Appellants.

Nos. 72–1686, 72–1687.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 14, 1972.

Decided Feb. 14, 1973.

Milt Schulman, Schulman & Schulman, Cleveland, Ohio, William R. Van Aken, Richard O. Horn, Cleveland, Ohio, for defendants-appellants; Henry Du-Laurence, Cleveland, Ohio, on brief, for appellants.

Walter C. Kelley, Jr., Cleveland, Ohio, for plaintiff-appellee; Fred J. Livingstone, of Kelley & McCann, Cleveland, Ohio, on brief, for plaintiff-appellee.

Before WEICK, PECK and MILLER, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

The Cuyahoga Metropolitan Housing Authority (CMHA) instituted this action[1] in the court below to enjoin the City of Cleveland from adopting a proposed ordinance which would have the effect of repealing a prior ordinance of the city authorizing it to enter into a Cooperation Agreement with CMHA. The prior ordinance provided for the development and administration by CMHA of 2500 dwelling units for persons of low income in the City of Cleveland. The action also sought to enjoin the city from cancelling the Cooperation Agreement executed pursuant to the prior ordinance. Federal jurisdiction was invoked under 28 U.S.C. § 1331(a), the complaint alleging the requisite jurisdictional amount and specifically asserting that the proposed ordinance, if adopted, would be violative of the contracts clause, Article I, Sec. 10 of the Federal Constitution and the due process clause of the Fourteenth Amendment, as well as certain provisions of the Ohio Constitution and statutes. The plaintiff's application for a temporary restraining order was denied on March 6, 1972. Thereafter, with the permission of the district court, plaintiff filed an amended complaint alleging that the City of Cleveland, after the denial of the temporary restraining order, had adopted on March 27, 1972, Ordinance 392–72 specifically repealing the prior Ordinance 836–71 which had authorized the city to enter into the Cooperation Agreement, and cancelling the Agreement itself which had been duly executed by the contracting parties on May 17, 1971. The amended complaint also predicated jurisdiction upon 28 U.S.C. § 1331(a), alleging the requisite jurisdictional amount and pleading violations of the same federal and state constitutional provisions and laws as the original complaint, except that the amended complaint also alleged that the actions taken by the City of Cleveland were violative of the Supremacy Clause.[2] (Article VI

1. There was a single action below but on appeal two numbers have been assigned because of some differences in the issues as between certain defendants, as will be noted. We treat all issues here as on one appeal.

2. Pursuant to Rule 65(a)(2), Federal Rules of Civil Procedure, the district court consolidated the hearing on the preliminary injunction with the hearing on the merits. He then, pursuant to the same authority, advanced the case for an early hearing. We do not find in the context of the case that there was any abuse of discretion on the part of the district court in permitting the plaintiff to drop from the amended complaint the members of the

of the Constitution of the United States).

Following a full hearing, the district judge filed and entered an elaborate memorandum opinion, Cuyahoga Met. Housing Auth. v. Cleveland, 342 F.Supp. 250 (N.D.Ohio, 1972), in which he concluded that Ordinance 392–72, which sought to repeal the prior ordinance and to cancel the Cooperation Agreement, was null and void. He determined that the Cooperation Agreement was a valid and subsisting contract. The defendants were permanently enjoined from any further proceedings or actions in violation of or interference with the plaintiff's rights under the Agreement. The ultimate conclusion reached by the district court was predicated upon a number of grounds, but its opinion focused primarily upon a finding that Ordinance 392–72, which sought to repeal the prior ordinance and to cancel the Cooperation Agreement, constituted an impairment of the obligation of a valid contract and thus was in violation of Article I, Sec. 10 of the Federal Constitution.

The city, in opposition to this view, argues that Ordinance 392–72 was a valid exercise of the reserved police power of the city and was not in violation of the contract clause or any other provision of federal or state law. For the reasons stated below, we are of the opinion, in the context of the present case, that the city, having entered into the Cooperation Agreement under a valid ordinance enacted pursuant to the provisions of both federal and state laws, was without power to abrogate the prior ordinance or to cancel the Cooperation Agreement.[3]

Before discussing the legal foundation for our conclusion some additional facts should be stated. As the district court found from undisputed evidence, after the formal execution of the Cooperation Agreement in May, 1971, CMHA, in reliance upon the Agreement, engaged in considerable activity to effectuate a plan to provide dwelling units in the City of Cleveland for persons of low income. It developed plans for 2,500 units over a two and one-half year period. Construction was to proceed in five separate phases which would eventually result in the development of 2,000 family units and 500 elderly units. In order to obtain financial assistance from the Federal government under the National Housing Act, it applied to the Department of

Citizens Committee and the city clerk as parties defendant, or in his refusal to permit the attorneys who represented three councilmen in their individual capacities to participate in the preparation and conduct of the trial. In this connection it should be pointed out that the hearing was an expedited one and that the attorneys for the Citizens Committee, as well as the attorneys for the three councilmen, were permitted to participate at the hearing as amicus curiae. Further, we think it is clear from the record that the interests of the City of Cleveland were properly represented by the city's counsel (through its law department) and that these procedural rulings of the district court were well within the range of his permissible discretion. While the rulings are questioned on appeal, we do not deem it necessary to discuss them in detail. Although at the time of the hearing no formal answers had been filed on behalf of any of the defendants the crucial issues had been fully explored and we have no doubt were clearly understood by the participating parties. It is not unusual to proceed with a hearing on an application for injunctive relief, particularly where, as here, the hearing has been properly expedited, before the issues have been developed by formal pleadings.

3. The district court clearly had jurisdiction under the claims set forth in the original and amended complaints. The requisite jurisdictional amount was alleged as well as violations of specific provisions of the Federal Constitution. The claims asserted were, in our view, not frivolous or insubstantial and jurisdiction was thus conferred on the district court pursuant to 28 U.S.C. § 1331(a). Since the complaints properly invoked federal jurisdiction on the basis of substantial federal questions, we are free to dispose of the case upon a federal or a state ground, or upon both. Cf. Silver v. L & N R. Co., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1945).

Housing and Urban Development (HUD) for a program reservation of 500 units. This request was duly approved by HUD. All of the 500 units in the first phase were designed for single family scattered units to be built under the traditional Turnkey method of construction. It appears, however, that the original plans and approvals were changed so that at the time of the hearing below 150 units were to be constructed under a Turnkey acquisition program. In order to meet the demands for development of the 2,500 units, CMHA hired an additional planner and real estate officer; it created a new position of Deputy Director; and it assigned additional staff members to accomplish the program's development. It formulated criteria to be forwarded to proposed Turnkey developers and obtained HUD's approval thereof. In addition, it placed legal advertisements inviting proposals for the development of the 500 Turnkey units. Proposals from ten developers were received by CMHA for 509 units. A considerable amount of time and money were devoted by the CMHA staff to the evaluation of the proposals. It further appears that the HUD staff also spent considerable time and effort in evaluating the proposals, after the CMHA staff had tentatively approved some one hundred proposed sites. Substantial time was also devoted by CMHA, its staff and Board, and by HUD in evaluating the financial and construction aspects of the various Turnkey proposals. As of the time of the hearing below, the CMHA Board had approved plans for approximately 71 sites in all respects and had agreed to enter into development programs therefor. These proposed programs had all been sent to HUD for funding by amendments to the existing Annual Contributions Contracts. Approvals, however, have been withheld by HUD because of the attempt by the City of Cleveland to abrogate the Cooperation Agreement and to withdraw its approval of the program. The proof shows that CMHA expended approximately $45,000 in the development and planning of the 500 scattered units as the first stage of construction under the 1971 Agreement. This money will not be refunded to CMHA unless the Cooperation Agreement is upheld. It appears further from the findings of the district court that federal funds amounting to approximately 62.5 million dollars will be withheld from CMHA, thus preventing it from carrying out its statutorily mandated purpose of providing persons of low income with decent, safe, and sanitary housing in the City of Cleveland.

Congress, in the United States Housing Act, 42 U.S.C. § 1401 et seq., has declared the National Housing policy of the country:

It is declared to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several States and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in urban, rural nonfarm, and Indian areas, that are injurious to the health, safety, and morals of the citizens of the Nation. In the development of low-rent housing it shall be the policy of the United States to make adequate provision for larger families and for families consisting of elderly persons. It is the policy of the United States to vest in the local public housing agencies the maximum amount of responsibility in the administration of the low-rent housing program, including responsibility for the establishment of rents and eligibility requirements (subject to the approval of the Authority), with due consideration to accomplishing the objectives of this chapter while effecting economies. 42 U.S.C. § 1401.

The statute provides an elaborate scheme to effectuate these objectives, primarily by means of financial assistance to local units of government. How-

ever, by the express terms of the Act, 42 U.S.C. § 1415(7)(b), federal assistance in the form of annual contributions or contracts for loans, other than preliminary loans, to local public housing agencies shall not be made "unless the governing body of the locality involved has entered into an agreement with the public housing agency providing for the local cooperation" required by the federal statute. It is also required by the federal statute that federal financial assistance shall not be forthcoming unless the local public housing agency has demonstrated "a need for such low rent housing which is not being met by private enterprise." 41 U.S.C. § 1415(7)(a).

In order to further the objectives of the national policy in Ohio, the legislature of that state has enacted numerous provisions. The state's policy is declared in unambiguous terms:

"It is hereby declared that it is necessary in the public interest to make provisions for housing families of low income and to provide for the elimination of congested and unsanitary housing conditions which exist in certain areas of this state and which are a menace to the health, safety, morals, welfare, and reasonable comfort of the citizens of this state." Ohio Rev.Code Ann. § 3735.26 (Page 1971).

A State Board of Housing is provided for and vested with wide supervisory powers. Ohio Rev.Code Ann. § 3735.01 (Page 1971). The State Board, upon a determination of need, is given authority to create metropolitan housing authorities for metropolitan areas. Ohio Rev.Code Ann. § 3735.27 (Page 1971). It was under the authority of this provision that the CMHA was created for the City of Cleveland. By § 3735.31 of the Ohio Revised Code, Annotated, the metropolitan housing authorities constitute bodies corporate and politic with a wide range of powers.

These include the conventional powers to sue and be sued, but in addition specific powers are conferred for the authorities to determine what areas constitute slum areas and to prepare plans for housing projects therefor, and to acquire property by lease, gift or by eminent domain and other methods. They are specifically authorized to accept grants or other financial assistance from the federal government "for or in aid of any housing project within [their] territorial limits," and "[to] enter into such . . . agreements as are necessary, convenient or desirable." Ohio Rev.Code Ann. § 3735.27 (Page 1971). Nothing appears in either the federal statute or in the Ohio legislation which could support either directly or by reasonable implication the proposition that a city, having validly declared the need for federal assistance for low rent housing and having executed with the local housing authority a Cooperation Agreement, could thereafter under its police power cancel the Agreement and withdraw from the program. It appears to us that the police power claimed on the part of the City of Cleveland in this case, if it should be upheld, would cause the state and national plans and policies with respect to low rent housing to rest upon a most tenuous basis—subject to frustration as the result of the vagaries of local politics or at the whim of local governing bodies.[4]

We are of the opinion that the policies underlying the national and state legislation under which the Cooperation Agreement in this case was made and entered into necessarily protect the Agreement against cancellation at the mere will of the city. The Agreement was manifestly designed to effectuate national and state purposes of great importance and the police power of a municipality cannot be invoked to interfere with their accomplishment. Such police power as the City of Cleveland possessed as to the particular subject matter was exhausted to the extent of its commit-

4. Indeed in the present case it appears that the Ordinance which sought to cancel the Cooperation Agreement was enacted soon after the city administration of Cleveland was substantially changed by a recent election.

ment after it found a need for low rent housing and entered into a solemn agreement with CMHA to obtain federal assistance.

The conclusion we have reached is particularly applicable in this case inasmuch as CMHA in reliance upon the Co-operation Agreement engaged in substantial activity and incurred a considerable expense. The Agreement provides, in our opinion, the only means by which it may be validly rescinded or revoked by the city, absent, of course, the application of some general principle of contract rescission which we do not find to be present in this case.

Since we find as a matter of law that the city, at least in the context of this case, did not have the right under the applicable state and federal housing laws to withdraw from the program or to cancel the Cooperation Agreement, we find it unnecessary to explore the issue as to whether the action taken by the city was in violation of the contract clause of the Federal Constitution.

While we have been unable to find any federal authority directly in point, we are in full agreement with the reasoning of the Supreme Court of California in Housing Authority v. City of Los Angeles, 38 Cal.2d 853, 243 P.2d 515 (1952). In that case the California Supreme Court held that under the federal statute with respect to low rent housing and similar provisions of the California statutes, the City of Los Angeles, having entered into a Cooperation Agreement, could not thereafter rescind or cancel it. The following language of the opinion is particularly apposite:

In enacting the Housing Authorities Law and the Housing Cooperation Law the legislature did not take from the city all power to act in connection with housing projects under the statute. The city was given discretionary power to determine initially the need for the housing authority to function and to give approval of a proposed project. The city was also vested with discretionary powers to be exercised pursuant to the cooperation agreement which is required under the federal act. 42 U.S.C.A. Sec. 1415(7)(b). But having taken the initial discretionary action to bring the housing authority into operation and having approved a project and entered into a cooperation agreement, there was nothing left to be done by either contracting party but to perform administratively whatever was necessary to carry the agreement into effect. Kleiber v. City, etc., of San Francisco, *supra*, 18 Cal.2d 718, 724, 117 P.2d 657; Housing Authority v. Superior Court, *supra*, 35 Cal.2d 550, 558, 219 P.2d 457.

Other issues are presented on appeal. We have carefully considered them and find them to be without merit.[5] Our

---

5. Pursuant to the Charter of the City of Cleveland an initiative petition was duly addressed to the City Council proposing that there be submitted to the electors of the city a proposed ordinance which would undertake to cancel the Cooperation Agreement entered into between the city and CMHA, as authorized by Ordinance No. 836–71, enacted May 10, 1971. Instead of submitting the proposed ordinance to the electors, the City Council adopted the proposed ordinance No. 392–72 on March 27, 1972. Thus, the 1971 Ordinance was repealed and the Cooperation Agreement was canceled without Council's giving any ground or reason for such cancellation and repeal. It was only after the injunction action was commenced that any claim of misunderstanding or mistake was made.

At the hearing in the district court an attempt was made by counsel for amicus curiae to offer evidence as to the reason for the cancellation, namely, that a committee of the council which negotiated the 1971 ordinance with the CMHA understood that the housing units would be built only after their proposed location would be presented to and approved by the City Council. The district court rejected such testimony and a proffer was made.

This evidence would conflict with the provisions of the Cooperation Agreement. No charge of fraud was made in the district court. We do not consider, therefore, any issue whether the enactment of

disposition of the case renders moot certain motions filed with this Court and not heretofore disposed of.

Affirmed.

the ordinance and the execution of the Cooperation Agreement were induced by fraud practiced on the city by CMHA, or by mistake.