Tony ARTHUR (Deceased), et
al., Plaintiffs,

Peggy Arthur, on her behalf and on be-
half of all others similarly situated;
Janice Holloway, Barbara Richardson
and Michael Webb, Plaintiffs-Appel-
lants,

v.

CITY OF TOLEDO, OHIO; Douglas De-
Good, in his official capacity as Mayor
of the City of Toledo; Gene Cook, Wil-
liam Copeland, Andrew Douglas, San-
dra Isenberg, Ray Kest, Daniel McNa-
mara, Raymond Nies, Leo Puccetti, in
their official capacities as Members of
the Toledo City Council; Walter Kane,
in his official capacity as City Manager
of the City of Toledo; Eugene Kasper,
in his official capacity as Director of
Public Service for the City of Toledo;
et al., Defendants-Appellees.

No. 84-3898.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 3, 1985.

Decided Jan. 24, 1986.

Rehearing and Rehearing En Banc
Denied April 2, 1986.

Thomas A. Karol (argued), Glenn G. Galbreath, Advocates for Basic Legal Equality, Inc., Toledo, Ohio, for plaintiffs-appellants.

Charles A. Matuszynski, John D. Scouten, Robert G. Young (argued), Sarah McHugh, William Connelly-lead counsel, Connelly, Soutar & Jackson, Toledo, Ohio, Kevin E. Joyce, for defendants-appellees.

Before KENNEDY and KRUPANSKY, Circuit Judges and BROWN, Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

Plaintiffs-appellants brought this class action against the City of Toledo ("the City"), the Lucas Metropolitan Housing Authority ("LMHA"), and various individual defendants in their official capacities as officers and agents of the City and LMHA. The District Court certified a class consisting of "all low and moderate income persons who are on the waiting list for Turnkey III housing" and a sub-class consisting of "all persons on the Turnkey III waiting list who are minority persons." Plaintiffs-appellants alleged violations of the fifth and fourteenth amendments to the United States Constitution; article I, section 10 ("the contract clause") of the United States Constitution; Title VIII of the Civil Rights Act of 1968 ("The Fair Housing Act of 1968"), 42 U.S.C. §§ 3601–3631; and 42 U.S.C. §§ 1981, 1982 & 1983. Plaintiffs-appellants challenged two September 13, 1977 referendum votes which repealed two city ordinances granting LMHA the authority to construct sewer extensions to Talmadge Woods and Sunbrook Glen, two proposed public housing sites.

On August 12, 1968, the City adopted a resolution approving the application by the Toledo Metropolitan Housing Authority ("TMHA"), the predecessor of LMHA, to

the Housing Assistance Administration of the United States Department of Housing and Urban Development ("HUD") for a preliminary loan to cover the costs of surveys and planning in the development or acquisition of approximately three thousand dwelling units for low-rent public housing in the City. Subsequently, the City and the TMHA entered into a "Cooperation Agreement" which required the City to "provide, or cause to be provided, water mains, and storm and sanitary sewer mains" leading to the low-rent housing sites. As a result of the resolution and the "Cooperation Agreement," between 1970 and 1977 the City applied for and received approximately $225–230 million in urban renewal funds from HUD.

During that period, HUD expressed concern that the City was failing to disperse the low and moderate income housing outside the inner city areas. In 1975, HUD established a requirement that the City develop three new housing units outside the central city renewal areas for every one unit within that area. In a letter from HUD Area Director Paul G. Lydens to Mayor Harry Kessler, Lydens stated: "In arriving at this ratio, [HUD] considered many factors and statistics, but in the end, this ratio is simply an effort to begin to redress the imbalance of housing opportunities for low and moderate income families in the City of Toledo."

On March 12, 1976, the City passed an ordinance authorizing the City Manager to submit an application for a $11,017,000 Block Entitlement Grant to HUD. The application stated that the proposed new construction "would meet Toledo's objective of dispersing housing that is affordable by low and moderate income families as well as meet HUD's criterion." An LMHA Site Selection Committee composed of various agencies including plaintiffs' counsel selected the Talmadge Woods and Sunbrook Glen sites for Turnkey III housing. HUD developed the Turnkey Home Ownership Program to enable limited-income families to purchase homes and obtain an upward mobility advantage in society. Under the program, a family pays for utilities, including

water and sewage, and then also pays twenty percent of the family's income for housing. Essentially, the family buys the home under a thirty-year lease-purchase agreement. If the family can later finance the balance owed through a conventional mortgage, the family can own the home in less than thirty years.

LMHA proposed to build sixteen single family detached homes at Talmadge Woods and seventeen single family detached homes at Sunbrook Glen, which is also known as Mellwood Court. LMHA hired Collaborative, Inc., an architectural firm to design homes for the two locations. Collaborative, Inc. designed thirty-three single family dwellings, which varied in design between wood and brick, to fit in with the existing neighborhoods. The Toledo City Plan Commission approved the Talmadge Woods plat on August 5, 1976 and the Sunbrook Glen plat on September 23, 1976.

The City Council referred the ordinances authorizing LMHA to construct sewer extensions to both sites to the City Services Committee for review and recommendation. Although the City Council had not previously referred any other sewer extension ordinances to the City Services Committee, the District Court found that on January 30, 1975 the Ohio Environmental Protection Agency notified the City that Sanitary Sewer # 49, which would have served Talmadge Woods and Sunbrook Glen, was at or very near maximum flow capacity. Consequently, the District Court found that the Ohio Environmental Protection Agency warning mandated the City's departure from "established procedure" and that a discriminatory purpose did not motivate the referrals to the City Services Committee. After the City Services Committee recommended disapproval of the sewer extension ordinances to both Talmadge Woods and Sunbrook Glen, the City Council rejected the ordinances on March 1, 1977 by a five to four vote.

After HUD threatened not to recertify the City's housing program and to withhold previously approved federal money in re-

sponse to the rejection of the sewer ordinances, the City resubmitted the sewer extension ordinances to the City Council. On March 24, 1977, the City Council passed the ordinances authorizing LMHA to construct the necessary sewers to both sites by five to four votes. Opponents of the projects, however, filed petitions requesting referendums on the two sewer ordinances with the City's Clerk of Council on April 23 and April 24, 1977. The City Council certified the two referendum petitions to the Lucas County Board of Elections, which held the referendums on September 13, 1977. By a vote of approximately three to one, the voters repealed the sewer extension ordinances.

The District Court tried the case on the issue of liability only. Over plaintiffs' objections, the District Court allowed defendants to introduce evidence of events occurring after the date of the challenged referendums. The District Court entered judgment for defendants and dismissed plaintiffs' complaint with prejudice. The District Court concluded that plaintiffs' claims were moot because the District Court could not order relief because the City had spent the federal funds on comparable units on scattered sites and no federal funds were currently available. The District Court also concluded that the breach of the "Cooperation Agreement" occurred by operation of law. The District Court found plaintiffs had not demonstrated either racial bias in the total electorate or discriminatory intent by the defendants. Finally, the District Court found that plaintiffs had not shown discriminatory impact because the referendums affected whites and minorities equally.

Plaintiffs-appellants raise five issues on appeal: (1) Whether the District Court properly held that plaintiffs-appellants' claims were moot; (2) Whether a referendum vote can excuse the City of Toledo from a breach of its contractual obligations with LMHA; (3) Whether the District Court's finding that plaintiffs-appellants had not demonstrated racial discrimination as a motivating factor in the referendum votes was clearly erroneous; (4) Whether

the District Court's finding that the referendums did not have a racially discriminatory effect and consequently did not violate the Fair Housing Act was clearly erroneous; and (5) Whether the District Court improperly admitted post-referendum evidence for the purpose of absolving defendants from liability for the alleged discriminatory acts. For the reasons set forth below, we hold that although plaintiffs' claims are not moot, the City did not breach its contractual obligations with the LMHA. We also hold that the District Court's findings that plaintiffs-appellants did not prove that the referendums had a racially discriminatory intent or effect are not clearly erroneous. Finally, we hold that the District Court properly admitted post-referendum evidence. Accordingly, we affirm the District Court decision entering judgment for defendants and dismissing plaintiffs' complaint with prejudice.

## I.

The District Court concluded that "[p]laintiffs [sic] claims are moot because the Court can offer no relief where no federal funds are available." Plaintiffs-appellants argue that since they sought damages as part of their prayer for relief from the alleged unlawful discriminatory actions, their claims are not moot because a violation of Title VIII of the Civil Rights Act of 1968 would at least entitle them to damages. Title 42 U.S.C. § 3612 permits private plaintiffs to bring civil actions to redress Title VIII violations. Title 42 U.S.C. § 3612(c) authorizes various remedies for fair housing violations and provides in pertinent part:

> The court ... may award to the plaintiff actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff....

Although the District Court found that LMHA used the federal funds that LMHA would have spent at Talmadge Woods and Sunbrook Glen on other low-income public housing sites, plaintiffs-appellants still

have a claim for damages if they can establish a violation of Title VIII. In *McDonald v. Verble*, 622 F.2d 1227 (6th Cir.1980), plaintiffs eventually purchased the property that defendants originally unlawfully refused to sell to them. This Court vacated the District Court's dismissal of the complaint at plaintiffs' cost and remanded the case to the District Court for determination of damages, costs, and attorney fees in favor of plaintiffs stating:

The fact that subsequent to the filing of a lawsuit, the sale of property was consummated with the McDonalds, does not alter the prior discriminatory conduct. Nor does that fact wipe out the need for consideration of damages. Much less does it serve to justify the award of costs to the offending parties on this record and against the McDonalds who were the offended parties.

*Id.* at 1233. *See also Smith v. Anchor Building Corporation*, 536 F.2d 231, 234 n. 4 (8th Cir.1976). Consequently, we hold that plaintiffs-appellants' claims for damages are not moot.

## II.

▮ Plaintiffs-appellants contend that the referendums repealing the sewer extension ordinances breached the 1968 "Cooperation Agreement" between the City and TMHA in which the City agreed to provide sanitary sewer mains to LMHA projects, as the successor of TMHA, at LMHA expense. The "Cooperation Agreement" provides in pertinent part:

6. In respect to any Project the Municipality further agrees that within a reasonable time after receipt of a written request therefore from the Local Authority:

....

(c) It will provide, or cause to be provided, water mains, and storm and sanitary sewer mains, leading to such Project and serving the bounding streets thereof (in consideration whereof the Local Authority shall pay to the Municipality such amount as would be assessed against the Project site for

such work if such site were privately owned).

7. If by reason of the Municipality's failure or refusal to furnish or cause to be furnished any public services or facilities which it has agreed hereunder to furnish or to cause to be furnished to the Local Authority or to the tenants of any Project, the Local Authority incurs any expense to obtain such services or facilities, then the Local Authority may deduct the amount of such expense from any Payment in Lieu of Taxes due or to become due to the Municipality in respect to any Project or any other low-rent housing. projects owned or operated by the Local Authority.

The District Court concluded that although the City breached the "Cooperation Agreement," "the breach of contract came about by operation of law." We hold, however, that the City did not breach the "Cooperation Agreement."

Plaintiffs-appellants contend that the City cannot avoid its contractual obligations through a referendum and that the referendums could not direct the City to breach its contractual obligations. Citing *Cuyahoga Metropolitan Housing Authority v. Harmody*, 474 F.2d 1102 (6th Cir. 1973), plaintiffs-appellants argue that the "Cooperation Agreement" required the City to pass the otherwise routine ordinances authorizing the necessary sewer extensions. In *Cuyahoga Metropolitan Housing Authority*, this Court held that the City of Cleveland could not adopt a proposed ordinance which would have had the effect of repealing a prior ordinance authorizing the city to enter into a Cooperation Agreement with the Cuyahoga Metropolitan Housing Authority and cancelling the Agreement itself. This Court stated that "the policies underlying the national and state legislation under which the Cooperation Agreement in this case was made and entered into necessarily protect the Agreement against cancellation at the mere will of the city." *Id.* at 1106. Quoting *Housing Authority v. City of Los Angeles*, 38 Cal.3d 853, 857, 243 P.2d 515, 519 (1952), this Court concluded:

"[H]aving taken the initial discretionary action to bring the housing authority into operation and having approved a project and entered into a cooperation agreement, there was nothing left to be done by either contracting party but to perform administratively whatever was necessary to carry the agreement into effect."

474 F.2d at 1107 (citations omitted).

The Ohio courts, however, have held that the sewer extension ordinances involved in this case were legislative, rather than administrative, in nature. In *Lucas Metropolitan Housing Authority v. Boyle*, C.A. No. L–77–173 (Ohio Ct.App. Sept. 9, 1977), LMHA appealed from the judgment of the Lucas County Common Pleas Court denying preliminary and permanent injunctive relief to prohibit the Lucas County Board of Elections from certifying the sewer extension ordinances for referendum vote. The Court of Appeals of Ohio, Sixth District, affirmed the judgment of the Lucas County Common Pleas Court, and the Supreme Court of Ohio refused to certify the record. Since the Ohio Constitution limits municipal referendum powers to legislative matters,[1] the court of appeals reasoned that LMHA's request for injunctive relief turned upon the question whether the sewer extension ordinances were legislative or administrative in nature. The court held that the sewer extension ordinances were legislative in nature stating:

> Plaintiffs-appellants [LMHA] argue that these ordinances merely administer or implement the previously enacted Resolution No. 257–68 and the subsequent Cooperation Agreement. However, the Resolution was a general policy statement recognizing the need in Toledo for low-rent housing, approving [LMHA's] application to HUD for a preliminary loan, and declaring Council's intention to enter into a cooperation agreement with

[LMHA]. Likewise, the Cooperation Agreement executed by the Mayor on the same date was a statement of general intention. Neither the Resolution nor the Agreement was self-executing. Both contemplated further legislative enactment to designate and approve specific projects.

*Id.,* slip op. at 3–4.

We hold that the "Cooperation Agreement" expressed the City's intention to cooperate with LMHA in sewer extensions. Since the "Cooperation Agreement" was not self-executing, the "Cooperation Agreement" did not guarantee that the City would accept every request for a sewer extension. Furthermore, previously quoted paragraph seven of the "Cooperation Agreement" indicates that the City and TMHA contemplated the City's "failure or refusal to furnish" public services to TMHA and provided a remedy for such failure or refusal. In fact, by law and as a matter of public policy, the City could not contract to enact future legislation. In essence, the "Cooperation Agreement" contained an implied term that the City would provide sanitary sewers, at LMHA's expense, if the City enacted the necessary enabling legislation. Under Ohio law, however, by referendum, the City's electorate could repeal the necessary enabling legislation. Since the referendums repealed the necessary enabling legislation, the City did not breach the "Cooperation Agreement."

### III.

Fed.R.Civ.P. 52(a) sets forth the appropriate standard governing appellate court review of a district court's findings of fact by providing in pertinent part: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court

---

**1.** *See also Myers v. Schiering,* 27 Ohio St.2d 11, 271 N.E.2d 864 (Syllabus 1) (1971) ("Under Section 1f of Article II of the Ohio Constitution, municipal referendum powers are limited to questions which municipalities are 'authorized by law to control by legislative action.' "). Un-

der Ohio practice, the syllabus of a decision of the Supreme Court of Ohio rather than the text of the opinion states the law of the case. *See Cassidy v. Glossip,* 12 Ohio St.2d 17, 231 N.E.2d 64 (1967).

to judge of the credibility of the witnesses." In *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), the Supreme Court stated that: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." As recently as *Anderson v. City of Bessemer City, North Carolina,* — U.S. ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), the Supreme Court wrote, "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." The Court later stated: "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 1512 (citations omitted).

Plaintiffs-appellants contend that the District Court's finding that racial discrimination was not a motivating factor in the referendums was clearly erroneous. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), the Supreme Court held that a plaintiff must present proof of a racially discriminatory intent or purpose to establish a violation of the equal protection clause. The District Court held that plaintiffs had not presented sufficient evidence to support the conclusion that racial discrimination motivated the City's electorate.

The Supreme Court has considered several cases involving referendums or initiatives and charges of racial discrimination. In *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), the Supreme Court held that an amendment to the Akron, Ohio city charter which prevented the city council from implementing any ordinance dealing with racial, religious, or ancestral discrimination in housing without the approval of the majority of the city's voters violated the equal protection clause. The petition of more than ten percent of the city's voters placed the proposal for the charter amendment on the ballot and a majority of the city's voters approved the amendment. The amendment not only suspended the operation of the existing city ordinance assuring "equal opportunity to all persons to live in decent housing facilities regardless of race, color, religion, ancestry or national origin," but also required the city's electorate to approve future racial, religious, or ancestral housing discrimination ordinances before the ordinance could take effect. Ordinances prohibiting other types of housing discrimination or otherwise regulating real estate did not require referendum approval. The Supreme Court concluded that an explicitly racial classification treated racial housing matters differently from other racial and housing matters. *Id.* at 389, 89 S.Ct. at 559. The Court decided that the amendment disadvantaged those groups who would have benefited from laws barring racial, religious, or ancestral discrimination as against other groups who would bar other discriminations or who would otherwise regulate the real estate market in their favor by making enactment of ordinances prohibiting racial, religious, or ancestral discrimination in housing substantially more difficult. On their face, however, the referendums at issue in this case are racially neutral.

In *James v. Valtierra*, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), the Supreme Court upheld Article XXXIV of the California Constitution, which amended the California Constitution to bring public housing decisions under California's referendum provisions, against an equal protection challenge. Article XXXIV provided that a state public body could not develop, construct, or acquire in any manner a low-rent housing project until a majority of the voters at a community election approved the project. The Supreme Court specifically rejected the invitation to extend *Hunter v. Erickson, supra,* 402 U.S. at 141, 91 S.Ct. at 1333. Since Article XXXIV did not rest on " 'distinctions based on race,' " *id.,* quoting *Hunter v. Erickson*, 393 U.S. at 391, 89 S.Ct. at 560, the Court concluded:

The people of California have also decided by their own vote to require referendum approval of low-rent public housing projects. This procedure ensures that all the people of a community will have a voice in a decision which may lead to large expenditures of local governmental funds for increased public services and to lower tax revenues. It gives them a voice in decisions that will affect the future development of their own community. This procedure for democratic decisionmaking does not violate the constitutional command that no State shall deny to any person "the equal protection of the laws."

*Id.* at 142–43, 91 S.Ct. at 1334 (footnote omitted). Defendants-appellees argue that this Court should uphold the referendums because the referendum power in this case has a broader application than the referendum power in *James v. Valtierra,* which dealt specifically and exclusively with public housing, because the City's electorate can approve or disapprove any legislative action.

More recently, in *Washington v. Seattle School District No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), the Supreme Court held that Initiative 350, a statewide voter initiative designed to terminate the use of mandatory busing for purposes of racial integration in the public schools in the State of Washington, violated the equal protection clause. The Court decided that the initiative used the racial nature of an issue to define the governmental decisionmaking structure and therefore imposed substantial and unique burdens on racial minorities. *Id.* at 470, 102 S.Ct. at 3195. The district court found that by carefully tailoring the initiative, the initiative permitted almost all of the busing previously taking place in Washington, except for desegregative busing. *Id.* at 465, 471, 102 S.Ct. at 3192, 3195. Although Initiative 350 was facially neutral because the initiative did not mention "race" or "integration," the Court did not doubt that the initiative organizers effectively drew the initiative for racial purposes. *Id.* at 471, 102 S.Ct. at 3195. Next, the Court concluded that from a practical standpoint, the initiative reallocated "the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests." *Id.* at 474, 102 S.Ct. at 3197. Since local school boards previously had the discretion to determine what program would most appropriately fill a school district's educational needs, the Court concluded that "Initiative 350 worked a major reordering of the State's educational decisionmaking process." *Id.* at 479, 102 S.Ct. at 3200. The Court, however, recognized that:

To be sure, "the simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification." As Justice Harlan noted in *Hunter,* the voters of the polity may express their displeasure through an established legislative or referendum procedure when particular legislation "arouses passionate opposition." Had Akron's fair housing ordinance been defeated at a referendum, for example, "Negroes would undoubtedly [have lost] an important political battle but they would not thereby [have been] denied equal protection."

*Id.* at 483, 102 S.Ct. at 3201 (citations omitted). Since Initiative 350 "burden[ed] all future attempts to integrate Washington schools in districts throughout the State, by lodging decisionmaking authority over the question at a new and remote level of government," the initiative "work[ed] something more than the 'mere repeal' of a desegregation law by the political entity that created it." *Id.*

■ In this case, we conclude that the City did not reallocate "the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests." *Id.* at 474, 102 S.Ct. at 3197. Rather, the City's electorate repealed ordinances authorizing sewer extensions to two, and only two, public housing projects. Nothing prevented low-income public hous-

ing in those neighborhoods or in other white neighborhoods. In fact, the City spent the money allocated to the two rejected projects on other similar projects in other white neighborhoods.

Plaintiffs-appellants contend that the District Court did not "make a sensitive inquiry as to whether race was a factor in the referendum election." Brief for Plaintiffs-Appellants at 30. While this Court recognizes that the City's "electorate as whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause ... and the City may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic," *City of Cleburne, Texas v. Cleburne Living Center,* —— U.S. ——, 105 S.Ct. 3249, 3259, 87 L.Ed.2d 313 (1985), neither the Supreme Court nor this Court has ever inquired into the motivation of voters in an equal protection clause challenge to a referendum election involving a facially neutral referendum unless racial discrimination was the only possible motivation behind the referendum results.[2]

Several important policy considerations limit a court's examination of the factors motivating the electorate in a referendum election. Initially, this country has tradi-tionally protected the "secret ballot." *See, e.g., Kirksey v. City of Jackson, Mississippi,* 663 F.2d 659, 661–62 (5th Cir.1981), *reh'g denied,* 669 F.2d 316 (1982). *See also Washington v. Seattle School District No. 1,* 458 U.S. at 465 n. 9, 102 S.Ct. at 319 n. 9 ("The District Court acknowledged that it was impossible to determine whether the supporters of Initiative 350 'subjectively [had] a racially discriminatory intent or purpose,' because '[a]s to that subjective intent the secret ballot raises an impenetrable barrier.' [473 F.Supp.] at 1014.") (dicta). Since a court cannot ask voters how they voted or why they voted that way, a court has no way of ascertaining what motivated the electorate. Furthermore, the Supreme Court has recognized the value of referendum elections. *See, e.g., James v. Valtierra,* 402 U.S. at 141, 91 S.Ct. at 1333 ("Provisions for referendums demonstrate devotion to democracy, not to bias, discrimination, or prejudice."). Consequently, this Court will not lightly set aside the results of voter referendums. Finally, in *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1292 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) ("*Arlington II*"), the Seventh Circuit warned that the "bigoted comments of

---

**2.** *Hunter v. Erickson, supra,* invalidated an amendment to the city charter which, on its face, mentioned racial discrimination. In *Washington v. Seattle School District No. 1, supra,* the Supreme Court concluded that since the initiative permitted almost all of the busing previously taking place in the state, except for desegregative busing, the initiative organizers effectively drew the initiative for racial purposes. *Id.* at 471, 102 S.Ct. at 3195.

In *United States v. City of Parma, Ohio,* 661 F.2d 562, 566, 575–76, *reh'g denied,* 669 F.2d 1100 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 *reh'g denied,* 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982), this Court upheld, as not clearly erroneous, the findings of fact supporting the district court's conclusion that the city's enactment and application of four land use ordinances, which imposed height, parking, and voter approval limitations on housing developments, violated the Fair Housing Act of 1968. The voters of Parma adopted two of the ordinances, one limiting all future residential structures to a height of thirty-five feet and the other requiring voter

approval for the development, construction or acquisition of a subsidized housing project by a public body or participation by individuals or non-public bodies in any federal rent subsidy program, by referendum. The district court specifically found that "the passage of the 35-foot height restriction ordinance [and] the passage of the ordinance requiring voter approval for low-income housing ... were motivated by a racially discriminatory and exclusionary intent." *Id.* at 568. Although this Court implicitly approved the district court's inquiry into the intent of the city's electorate, the parties did not specifically raise the question of whether a court could inquire into the motivation of voters in a referendum election. We reach this conclusion because less than three years later in *United States v. City of Birmingham, Michigan,* 727 F.2d 560, 565 (6th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984), another Fair Housing Act case, this Court expressly reserved the question "whether a district court may make a judicial examination of the motivation of voters in an advisory referendum election."

a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis." Although the District Court found that "a few individuals made racial slurs in contacts and meetings leading to the Referendum of 1977," the District Court also found that "[a]bsent any facts to the contrary, the Court cannot infer racial bias in the total electorate." If courts could always inquire into the motivation of voters even when the electorate has an otherwise valid reason for its decision, a municipality could never reject a low-income public housing project because proponents of the project could always introduce race as an issue in the referendum election.

Plaintiffs-appellants cite *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. at 270 n. 21, 97 S.Ct. at 566 n. 21 (proof that a racially discriminatory purpose motivated the Village's decision would have shifted the burden to the Village to establish that the Village would have reached the same decision absent the racially discriminatory purpose), and *Smith v. Town of Clarkton, North Carolina*, 682 F.2d 1055, 1066 (4th Cir.1982) (emphasis in original) ("It is not necessary, in proving a violation of the equal protection clause, to show that the challenged actions rested *solely* on a racially-discriminatory intent in order to demonstrate that the involved officials acted with an intent to illegally discriminate."), for the proposition that if discriminatory intent motivated the electorate, the District Court could not brush aside racial discrimination even if the District Court also found that other factors motivated the electorate. Carried to its logical extreme, plaintiffs-appellants could establish a violation of the equal protection clause if one voter testified that racial considerations motivated the voter's vote to repeal the sewer extension ordinances. Furthermore, we note that although courts have inquired into the votes of city council members, the policies underlying the "secret ballot" prevent courts from inquiring into the votes of the electorate. Fed.R.Evid. 606(b) prohibits federal courts from inquiring into the validity of a jury verdict. *See* Fed.R.Evid.

606(b) advisory committee note. Similar policy reasons prohibit courts from asking voters how they voted or why they voted as they did. Just as a juror cannot set aside a jury verdict, courts should not permit a member of the electorate or an expert witness to set aside an election or referendum. Accordingly, we conclude that we cannot apply the "motivating factor" test to equal protection clause challenges to referendum elections.

 The equal protection clause, however, would require this Court to set aside a referendum if the referendum, although facially neutral, engendered discrimination based on an obvious racial classification. *See, e.g., Washington v. Seattle School District No. 1*, 458 U.S. at 471, 102 S.Ct. at 3195 (1982) ("despite its facial neutrality there is little doubt that the initiative was effectively drawn for racial purposes"). We hold that absent a referendum that facially discriminates racially, or one where although facially neutral, the only possible rationale is racially motivated, a district court cannot inquire into the electorate's motivations in an equal protection clause context. Furthermore, in this case, the City introduced evidence that concerns regarding the costs of the projects, flooding and sanitary sewer surcharges, and the general advisability of the projects influenced the electorate's decision. Accordingly, we hold that the District Court did not err in concluding that plaintiffs-appellants had not presented sufficient evidence to justify a finding that the referendum electorate intended to racially discriminate.

## IV.

Plaintiffs-appellants also sought relief under the Fair Housing Act of 1968. In *Arlington II, supra* at 1290, the Seventh Circuit held that "at least under some circumstances a violation of [the Fair Housing Act] can be established by a showing of discriminatory effect without a showing of discriminatory intent." *See also Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1036–37 (2d Cir.1979); *Resident Advisory*

Board v. Rizzo, 564 F.2d 126, 146–48 (3d Cir.1977), cert. denied, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); United States v. City of Black Jack, Missouri, 508 F.2d 1179, 1184–85 (8th Cir.1974), cert. denied, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694, reh'g denied, 423 U.S. 884, 96 S.Ct. 158, 46 L.Ed.2d 115 (1975). Plaintiffs-appellants contend that the District Court's finding that the referendums did not have a discriminatory impact is clearly erroneous. Although the Arlington II court "refuse[d] to conclude that every action which produces discriminatory effects is illegal," 558 F.2d at 1290, the Seventh Circuit did enumerate four factors for determining whether conduct which produces a discriminatory effect but which did not have a discriminatory intent violates the Fair Housing Act:

(1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of Washington v. Davis; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

Id.

We adopt three of the four factors pronounced in Arlington II. Under the second factor, the Seventh Circuit inquired whether plaintiffs introduced some evidence of discriminatory intent. The court, however, concluded that this factor was "the least important of the four factors." Id. at 1292. We agree and additionally decide not to consider this factor in our analysis. Since plaintiffs-appellants did not present sufficient evidence to allow the conclusion that the electorate racially discriminated in the referendums, plaintiffs-appellants should not receive "half-credit" for discriminatory intent under their Fair

Housing Act claim. Accordingly, we adopt only the first, third, and fourth factors that the Seventh Circuit established in Arlington II.

Applying those factors to the present case, we conclude the electorate did not violate the Fair Housing Act. Initially, we reiterate that plaintiffs-appellants have challenged the results in two referendum votes. Under the third factor of the Arlington II test, a court considers the defendant's interest in taking the challenged action. Given the strong policy considerations underlying referendums, we fear that recognizing a cause of action in such instances goes far beyond the intent of Congress and could lead courts into untenable results. Accordingly, we hold that, absent highly unusual circumstances, the discriminatory effect of a referendum cannot establish a violation of the Fair Housing Act.[3]

We further conclude that even if we also considered the first factor, which considers the strength of plaintiff's showing of discriminatory effect, and the fourth factor, which examines plaintiff's requested relief, in the Arlington II test, the District Court did not err in concluding that plaintiffs-appellants had not established a violation of the Fair Housing Act. Under the first factor, the Seventh Circuit recognized two types of discriminatory effects which a facially neutral housing decision can have.

The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.

Id. at 1290 (citation omitted). In Arlington II, the Seventh Circuit found a relatively weak discriminatory effect of the first

3. A plaintiff can challenge a referendum on equal protection grounds if the referendum had a discriminatory intent. See supra pp. 570–

573. Furthermore, a plaintiff can also establish a Fair Housing Act violation by proving discriminatory intent.

type. Although "the Village's refusal to rezone had an adverse impact on a significantly greater percentage of the nonwhite people in the Chicago area than of the white people in that area," "the class disadvantaged by the Village's action was not predominantly nonwhite, because sixty percent of the people in the Chicago area eligible for federal housing subsidization in 1970 were white." *Id.* at 1291. Likewise, in this case, we conclude that plaintiffs-appellants did not demonstrate a significant effect.

The District Court held that plaintiffs-appellants failed to demonstrate adverse impact because based on 1980 United States Census data 84.3 percent of the low-income households in Toledo eligible for the Turnkey program were white. The District Court rejected plaintiffs-appellants' claim that the referendums had a racially discriminatory effect because "more whites than minorities were denied housing in Talmadge Woods and Sunbrook Glen, based on the population eligible." The District Court continued: "The plaintiffs' claim that approximately 50% of the affected households were minorities would produce the conclusion that whites and minorities were equally impacted, based on the LMHA waiting list for Turnkey III housing." Finally, the District Court concluded:

> [T]he Referendum impacted at best the whites and minority equally, and at worst on the white eligibles by a 5 to 1 ratio. Disparate minority impact has not been proved, nor has any *intent* by the authorities been shown. On the contrary, the evidence overwhelmingly shows an intense effort on the part of the City and LMHA to desegregate Toledo.

(Emphasis in original).

Plaintiffs-appellants argue that since blacks comprised seventy-one percent of those on the waiting list for the homeownership program, the referendums had a racially discriminatory effect. The District Court, however, specifically found that: "Those class members who were eligible for the proposed 33 units of Talmadge Woods and Sunbrook Glen were offered 35 units of comparable housing." LMHA Deputy Director Charles Matuszynski testified that the LMHA took the applicants for those thirty-five homeownership units from the same waiting list which would have governed the selection process at Talmadge Woods and Sunbrook Glen. Matuszynski also testified that an August 1983 LMHA study of the thirty-five units of comparable housing showed that whites occupied fifteen units and blacks occupied eighteen units, while two units remained unoccupied. The District Court, however, found that the "racial makeup of the LMHA homeownership eligibility list does not accurately reflect the racial makeup of the households in Toledo that could have occupied Turnkey III housing at Talmadge Woods or Sunbrook Glen or who currently occupy the dispersed site homeownership units." Although the District Court should have focused on the waiting list for the Turnkey III projects, rather than on the general population, we conclude that plaintiffs-appellants presented, at best, only relatively weak evidence of discriminatory effect of the first type.

■ While discussing the second prong of the first factor, the factor which considers the discriminatory effect of an action, the *Arlington II* court stated that the fact that conduct adversely affected white as well as nonwhite people does not by itself preclude relief under the Fair Housing Act. 588 F.2d at 1291. Conversely, however, the fact that conduct adversely affected nonwhite people does not by itself guarantee relief under the same statute. Under this second prong, plaintiffs-appellants argue that the referendums perpetuated segregation in the City. In this case, however, the electorate did not reject public housing but only two particular public housing projects. The District Court specifically found that LMHA offered individuals who were eligible for the Talmadge Woods and Sunbrook Glen projects thirty-five units of comparable housing. Although those on the waiting list for the Talmadge Woods and Sunbrook Glen projects did not receive

public housing as soon as they would have had the City's electorate approved the sewer extension ordinances, they eventually did receive Turnkey III public housing in predominantly white neighborhoods. We conclude that not every denial, especially a temporary denial, of low-income public housing has a discriminatory impact on racial minorities sufficient to establish a prima facie violation of the Fair Housing Act. Accordingly, naked effect of an action by a governmental subdivision, without more, does not invoke the provisions of the Fair Housing Act. Otherwise municipalities would be forced to approve public housing projects regardless of cost, design, or other considerations.

Under the *Arlington II* court's third factor, a court should next examine the defendant's interest in taking the action that produces a discriminatory impact. Any discriminatory effect in this case arose out of two referendums. The policy considerations underlying referendum elections do not require any additional discussion. Finally, under *Arlington II*'s fourth factor, we again note that the referendums only rejected sewer extensions to two particular public housing projects. Since the City has provided low-income housing in other predominantly white neighborhoods, we reject the invitation to order the City to construct low-income housing at the Talmadge Woods and Sunbrook Glen sites. Accordingly, we hold that the District Court's finding that the referendums did not have a racially discriminatory impact is not clearly erroneous.

### V.

Plaintiffs-appellants repeatedly objected to the District Court's rulings permitting defendants to introduce evidence of events occurring after the September 13, 1977 referendums. If plaintiffs-appellants had brought only an equal protection claim, this argument may have some merit. Plaintiffs-appellants, however, also brought a claim under the Fair Housing Act of 1968. As previously mentioned, plaintiffs-appellants could succeed on this latter claim by showing a discriminatory effect. When examining the effect of an action, a district court must examine the action in the context of the totality of the circumstances. Accordingly, the City's efforts to supply alternative low-income housing in racially segregated white areas after the referendums was relevant in determining whether the referendums had a racially discriminatory effect. Consequently, the District Court did not err in admitting evidence of post-referendum events.

Accordingly, we affirm the decision of the District Court entering judgment for defendants and dismissing plaintiffs-appellants' complaint with prejudice.

