*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0299P (6th Cir.)
File Name: 01a0299p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BUCKEYE COMMUNITY HOPE
FOUNDATION, et al.,
  *Plaintiffs-Appellants/*
   *Cross-Appellees,*

   *v.*

CITY OF CUYAHOGA FALLS, et
al.,
  *Defendants-Appellees/*
   *Cross-Appellants.*

Nos. 99-4555;
00-3052

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 96-01458—Dan A. Polster, District Judge.

Argued: June 15, 2001

Decided and Filed: August 31, 2001

Before: JONES, DAUGHTREY, and COLE, Circuit
Judges.

1

—————————————

**COUNSEL**

**ARGUED:**   Edward G. Kramer, KRAMER & ASSOCIATES, Cleveland, Ohio, for Appellants.  Virgil E. Arrington, LAW DIRECTOR, CITY OF CUYAHOGA FALLS, Cuyahoga Falls, Ohio, for Appellees.  **ON BRIEF:** Edward G. Kramer, KRAMER & ASSOCIATES, Cleveland, Ohio, Diane E. Citrino, FAIR HOUSING LAW CLINIC, Cleveland, Ohio, for Appellants.  Virgil E. Arrington, LAW DIRECTOR, CITY OF CUYAHOGA FALLS, Cuyahoga Falls, Ohio, for Appellees.

—————————————

**OPINION**

—————————————

NATHANIEL R. JONES, Circuit Judge.   This case involves a federal civil rights suit brought by Plaintiffs-Appellants, Buckeye Community Hope Foundation, et al., against the Defendants-Appellees, the City of Cuyahoga Falls ("City"), et al., alleging that the City's decision to allow a referendum to stay the effectiveness of Appellants' lawfully approved site plan violated their constitutional and statutory rights.   Appellants appeal the district court's grant of summary judgment which dismissed their equal protection, substantive due process, and Fair Housing Act claims. Because there are genuine issues of material fact with regard to all three claims, we **REVERSE** the lower court's grant of summary judgment.

## I. BACKGROUND[1]

Plaintiff, the Buckeye Community Hope Foundation ("Foundation"), is a not-for profit 501(c)(3) corporation. It has as its purpose the development of affordable housing through the use of low-income housing tax credits. For each project, a separate limited partnership is formed as the investment vehicle to sell the tax credits. In this case, the specific limited partnership is plaintiff, Buckeye Three Limited. The limited partnership is the owner of the land, and once it is completed, the development. To protect each development and its investors, the Foundation forms a separate corporation to act as the general partner for the limited partner. In this case, plaintiff Cuyahoga Partners, Inc., a for-profit corporation, was formed to serve as the general partner of Buckeye Three Limited. Steven Boone is the president of Cuyhaoga Partners, Inc.

Mr. Boone contacted the Mayor of the City of Cuyahoga Falls, Don Robart, in the summer of 1995 about the possibility of developing a low-income housing complex in Cuyahoga Falls. According to Mr. Boone, the Mayor expressed no problems about the proposed development at that time.

On June 12, 1995, the Foundation purchased the real property located on Pleasant Meadow Boulevard. On February 21, 1996, the "site plan" for the property was submitted for approval at a meeting of the Planning Commission for Cuyahoga Falls. Members of the public attended this meeting and raised several questions about the project. Some of the citizens expressed concern about the impact that the project would have on their neighborhood. For example, Lee Minier, a lifelong resident of Cuyahoga Falls, expressed concerns about safety and stated "they know what

---

[1]These facts are derived primarily but not exclusively from Judge Bell's opinion below. *See Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 970 F. Supp.1289 (N.D. Ohio 1997).

kind of element is going to move in there." Joint Appendix ("J.A.") at 154. Another resident stated that "[t]here will be a different class of people living there." *Id.* In connection with the Planning Commission's meeting, Cuyahoga Planning Director, Louis Sharpe, prepared a Staff Summary of the site plan. This summary recommended approval of the site plan subject to approximately nine conditions agreed to by Mr. Boone. One of the conditions required the developers to erect a fence on one side of the property before the building permit for the apartment complex could issue.

Notwithstanding the aforementioned opposition of various citizens, the site plan, including the conditions, was unanimously approved by the Planning Commission at the February 21, 1996 meeting. The Planning Commission's recommendation then had to be submitted to and approved by the City Council. Mayor Robart did not attend the February 21, 1996 Planning Commission meeting.

On March 4, 1996, the Planning Commission's recommendation on the site plan was addressed at a City Council meeting attended by Mayor Robart. At this meeting, members of the public again voiced their concerns about the project. Ann Bridges expressed concern about the extra crime and drugs that come with low-income housing. J.A. at 961. Mayor Roberts voiced his opposition to the project. The Mayor referred to an article entitled "Stuck in the Ghetto" which discussed the various problems associated with Section 8 housing (the project at issue does not involve Section 8 vouchers). J.A. at 966.

Another City Council meeting was held on March 18, 1996. Once again, members of the public expressed their opposition to the project. One resident of Cuyahoga Falls objected to the project on the ground that "[t]here will be . . . kids running around in our yards." J.A. at 949. Mayor Robart, in a lengthy statement, once again voiced his opposition. The Mayor stated that the issue was not whether the project was properly zoned, but rather the issue was low-income housing. The Mayor

code, the defendants allowed a referendum to decide whether plaintiffs' project would go forward. Clearly, plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to whether the defendants, by denying plaintiffs the benefit of the lawfully approved site plan, engaged in arbitrary, irrational, and therefore unconstitutional application of the law in violation of plaintiffs' right to due process.[6]

### E. Res Judicata

Defendants also assert that plaintiffs' federal claims are barred by the doctrine of *res judicata* since the federal suit stems from the same transaction or occurrence as the state suit which sought to enjoin the referendum. We find that Judge Bell's exhaustive treatment of this issue below to be persuasive; accordingly, we adopt the lower court's finding that plaintiffs' suit is not barred by *res judicata. See Buckeye Cmty. Hope Found.,* 970 F. Supp at 1297-1303.

### III. CONCLUSION

For the foregoing reasons, we find that there are triable issues of fact with respect to plaintiffs' equal protection, Fair Housing Act, and substantive due process claims; accordingly, we **REVERSE** the district court's grant of summary judgment.

---

[6]Plaintiffs in their brief also assert a procedural due process claim based on defendants "subjecting them to . . . an extra layer of administrative process--a procedure without clear, rational rules to which they could look for guidance in planning to develop their property." *See* Plaintiffs' Br. at 50. This is actually a substantive due process claim, since the claim essentially amounts to an attack on the rationality of the referendum procedure itself. Therefore, this claim merges with the substantive due process arguments discussed above.

process. Plaintiffs have presented substantial evidence that their proposed complex met all of Cuyahoga's legal requirements. Planning Director Louis Sharpe testified that "I have no rational reasons whatsoever to say that there is anything wrong with [plaintiffs'] site plan . . . . [T]he plan met the requirements of the City of Cuyahoga Falls in all respects, it exceeded those, and I would find no reason to deny it on a legal or professional basis." J.A. at 722. Mr. Stroup, another member of the Planning Commission, stated that the Commission has an obligation to approve the site plan because it exceeds the zoning requirements. J.A. at 158. Plaintiffs' expert witness, Allen Fonoroff, stated that:

> the public vote rescinding Ordinance No. 48-1996 which had approved the Site Plan for the Pleasant Meadow Apartment Complex was not based on compliance with municipal zoning and land use[] laws of the City of Cuyahoga Falls. Ballot box decision-making exacerbates the problems inherent within traditional zoning decisions. The results are usually more extreme than those decided by local Planning Commissions since the public tends to react and vote their fears and prejudices (namely lowering of property values, introduction of incompatible lifestyles and the tax burden of new children on the local school system) as reasons for denying an appropriate lawful site plan.

J.A. at 737. Fonoroff concluded that there was no rational basis for the rejection of the site plan as it conforms completely with all of the City's regulations. J.A. at 733. Indeed, Mayor Robart forthrightly acknowledged that the issue was not whether the project was properly zoned, but rather the issue was low-income housing. J.A. at 945. While the Mayor's statement may reflect the views of his constituents, it directly contravenes the legal opinion of the City's own law director, who wrote "[the] rejection [of a site plan] must be based upon those site related factors mentioned in the zoning code." J.A. at 817. Despite being aware that plaintiffs' project was entirely consistent with the zoning

noted that "people who spent a lot of money on their condominiums simply don't want people moving in their neighborhood that are going to be renting for $371." J.A. at 945. Another Council meeting occurred on April 1, 1996, and the site plan was approved by a vote of six to three with two abstentions. The City Council's approval was expressed in the form of Ordinance No. 48-1996.

Parallel to the site approval process, a referendum effort was proceeding. On April 9, 1996, the "Citizens for the Preservation of Voter Rights" convened a meeting to discuss "taking the ISSUE OF A 72 UNIT HOUSING DEVELOPMENT ON PLEASANT MEADOW BLVD. to the vote of the people of Cuyahoga Falls in November." The Mayor spoke at the meeting and stated that he supported the referendum effort. Lee Minier testified that no City of Cuyahoga Falls officials were asked to sign the referendum petitions. On or about April 29, 1996, a referendum petition was submitted to the Clerk of City Council, Gregg Wagner. The Board of Elections approved the referendum petition on May 1, 1996.

On May 1, 1996, plaintiffs filed a state action in the commons pleas court of Summit County to enjoin the referendum process under Ohio law. The plaintiffs sought injunctive relief and a declaration that the ordinance could not be challenged by referendum because its passage by City Council was an administrative, rather than a legislative action. Plaintiffs claimed that Article II, Section 1f of the Ohio Constitution did not grant powers of referendum to citizens of municipalities on administrative actions taken by municipal legislative bodies. On May 15, 1996, the state trial court conducted a hearing on plaintiffs' request for preliminary injunction. On May 31, 1996, the court denied the plaintiffs' motion for preliminary or permanent injunction. The court found that the Charter of Cuyahoga Falls permitted the residents of Cuyahoga to exercise powers of referendum on any action by City Council, regardless of whether the action taken was legislative or administrative in nature. Plaintiffs

appealed the decision of the trial court to the court of appeals for Summit County.   The court of appeals affirmed the judgment of the trial court, holding that Article II, Section 1f of the Ohio Constitution does not limit the referendum powers of charter municipalities such as Cuyahoga Falls. The Ohio Supreme Court affirmed the judgment of the court of appeals.

On June 20, 1996, Gilbertson Barno, the Executive Director of the Foundation, wrote to the City of Cuyahoga Falls seeking the issuance of a building permit. On June 26, 1996, Gerald Dzurilla, the City Engineer for Cuyahoga Falls, sent a letter to Barno indicating that he could not issue the building permit in light of the pending referendum.

Plaintiffs filed the present federal action on July 5, 1996. In contrast to the complaint filed in state court, the complaint filed in federal court was based on federal law. The plaintiffs alleged violations of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., 42 U.S.C. §§ 1981 and 1982, the Due Process Clause of the Fourteenth Amendment via 42 U.S.C. § 1983, and the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983.   Plaintiffs sought injunctive relief and damages.   Defendants brought a motion for summary judgment seeking to dismiss all of plaintiffs' claims. On November 19-21, 1996, Judge Sam H. Bell conducted a hearing and heard evidence regarding plaintiffs' request for a preliminary injunction. Ultimately, the court approved an injunction stipulated to by the parties which enjoined the Summit County Board of Elections from certifying the results of a referendum concerning plaintiffs' ability to build low-income housing on land in Cuyahoga Falls.   However, because the lower court found that plaintiffs failed to prove irreparable harm, their request for an injunction ordering the City of Cuyahoga Falls to issue a building permit was denied. In the order denying plaintiffs' preliminary injunction request, Judge Bell deferred consideration of the merits of the underlying causes of action, concluding that such consideration would be more appropriately addressed after

1981)). We find the Fifth Circuit's decision in *Wheeler v. City of Pleasant Grove*, 664 F.2d 99 (5th Cir. 1981) to be on point. In *Wheeler*, the developers had a legitimate permit under an existing zoning ordinance to build an apartment complex. *Id.* at 100. However, news of the construction of the apartment complex caused an uproar. *Id.* A referendum was held, which showed an overwhelming resistance to the proposed apartment complex. The upshot of the referendum was the passage of a new city ordinance which forbade the construction of new apartments. *Id.* The Fifth Circuit noted that if a zoning ordinance is "'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare'" it must be struck down. *Id.* (quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926)). The Court found that the city's deference to the majority will as reflected in the new ordinance was not rational and therefore violated plaintiff's right to due process. *Id.* Similarly, in *TLC Development Inc., v. Town of Brandford*, a lower court held that:

A town, through its Commission, cannot arbitrarily refuse to permit a landowner to use land if the proposed use comports with the uses permitted in the district in which the land is located.  By articulating the uses permitted in a district, a town has fixed the uses which accommodate all the considerations permitted by the law in adopting a town plan. Once it has done so, a town cannot prevent a permitted use based on factors which might have been, or were, considered in deciding the uses permitted in the zoning district.

855 F. Supp. 555, 558 (D. Conn. 1994).

Both *Wheeler* and *TLC Development* establish that when a city denies a landowner the benefit of a general zoning scheme, despite its belief and/or knowledge that the landowner's property is entirely consistent with that scheme, it runs afoul of the Fourteenth Amendment's guarantee of due

classification within which his development was permitted. That property interest was securely vested by Nasierowski's engagement in substantial acts taken in reliance, to his detriment, on representations from and affirmative actions by the City." *Id.* at 897. Similarly, in the case at bar, plaintiffs' property interest was securely vested upon the City's affirmative representation that the site plan conformed with the existing zoning regulations as reflected by the City's approval, by ordinance, of the site plan.

Having determined that plaintiffs have a cognizable property interest at stake, the next question is whether the defendants are "guilty of arbitrary and capricious action" in denying plaintiffs the benefit of their City Council-approved site plan. *Pearson*, 961 F.2d at 1221. Judge Polster found that the defendants' actions were not arbitrary and capricious because the City was simply following its own law providing for the use of referendum. J.A. at 60. However, the Supreme Court has stated that "[i]f the substantive result of the referendum is arbitrary and capricious . . . then the fact that the voters . . . wish it so would not save the [zoning] restriction." *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 676, 96 S.Ct. 2358, 2363, 49 L.Ed.2d 132, 139 (1976); *cf. Brookpark Entertainment, Inc. v. Taft*, 951 F.2d 710, 716 (6th Cir. 1991) ("The concern is that the voters might 'gang up' to drive out of business a seller of liquor whom they disliked for reasons unrelated to any plausible public interest. This is a distinct type of arbitrary action that the requirement of fair procedure is designed to prevent . . . .") (quoting *Philly's v. Byrne*, 732 F.2d 87, 92 (7th Cir. 1984)). Thus, the question remains whether the defendants' actions were arbitrary and capricious.

To prevail on a substantive due process claim, "a plaintiff must show that the state administrative agency has been guilty of 'arbitrary and capricious action' in the *strict* sense, meaning that 'there is no rational basis for the . . . [administrative] decision.'" *Pearson*, 961 F.2d at 1221 (quoting *Stevens v. Hunt*, 646 F.2d 1168, 1170 (6th Cir.

evaluation of defendants' motions for summary judgment. Judge Bell then referred those motions to Magistrate Judge James D. Thomas for a report and recommendation. Judge Thomas recommended that defendants' motions for summary judgment be granted.

Judge Bell ultimately disagreed with the magistrate's recommendation. Judge Bell noted that in order to understand plaintiffs' federal claims it is important to understand the procedural context in which the referendum arose:

The Cuyahoga Falls City Council approved the ordinance which embodied [p]laintiffs' site plan on April 1, 1996. The Mayor did not sign the ordinance, but according to City Charter Article 2, Section 5, if the mayor does not act upon the ordinance within ten days then the ordinance shall take effect in the same manner as if he had signed it, what this court will refer to as "pocket approval." So ten days after its passage by the Council, the ordinance was pocket approved by the Mayor. As of this stage there was no evidence that the City [d]efendants did anything to give effect to the citizen's [sic] petition.

. . . .

[T]he ordinance was to take effect "as provided by law". . . . Ohio Revised Code Section 705.16 provides that "All ordinances or resolutions shall be in effect after thirty days from the date of their passage . . . ." Section 1.14 of the Ohio Revised Code tells us that when counting thirty days, the first day is excluded and the last day included. . . . [T]he ordinance was to take effect . . . on May 2, 1996.

. . . .

The City Charter states that within 30 days after the Council passes an ordinance, citizens of the city may file

a petition signed by at least ten percent of the electors requesting that such ordinance be repealed or submitted to the voters as a referendum. (Charter Art. IX, § 2.) Such a petition was filed in this case on or about April 29,1996. If the ordinance so challenged is not repealed by the Council within 30 days, the ordinance is to be submitted to a vote of the people. The ordinance itself cannot "go into effect until approved by a majority" of the electorate. (Charter Art. IX, § 2.)

. . . .

It is axiomatic that in order for an ordinance to "go into effect" it cannot already be in effect. . . . [T]he court must conclude that the ordinance has never gone into effect. At some moment in time after the filing of the petition and before the ordinance was to take effect on May 2, the effectiveness of the ordinance was stayed.

*See Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 970 F. Supp. 1289, 1307-08 (N.D. Ohio 1997).

Judge Bell further noted that upon the filing of the petition, City Engineer Dzurillla sought advice from the City Law Director concerning the effect of the petition on his authority to issue building permits for the property identified in the ordinance. On April 30, 1996, Dzurilla received a response indicating that building permits for the construction of the apartment complex could not be issued because the site plan ordinance "does not take effect" due to the petitions. *Id.* at 1308. Judge Bell concluded that "practically as well as theoretically speaking, the [p]laintiffs were unable to secure the benefit of their otherwise lawfully approved site plan on the date that the site plan was to take effect, May 2, 1996." *Id.*

After extensive legal analysis, Judge Bell concluded that there were genuine issues of material fact precluding summary judgment with respect to plaintiffs' race-based equal protection, Fair Housing Act, and substantive due process claims. *Id.* at 1316, 1318, 1320.

at stake in this case arose from the City Council's approval of plaintiffs' site plan and the alleged substantive due process violation resulted from defendants' use of a referendum to deny plaintiffs the *benefit* of their lawfully approved site plan. One tangible benefit of site plan approval is a building permit which would have allowed construction on the plaintiffs' project to begin.[5]

In light of the property interest at stake, we find this court's decision in *Nasierowski Brothers Investment Co. v. City of Sterling Heights*, 949 F.2d 890 (6th Cir. 1991) to be instructive. In *Nasierowski*, the plaintiff sought to purchase an undeveloped parcel of real estate. *Id.* at 891. Nasierowski's acquisition of the property was made expressly contingent on obtaining an opinion from the city stating that its proposed development was permitted as of right. *Id.* The city so informed Nasierowski, and he purchased the property. *Id.* After Nasierowksi's purchase, however, it became obvious that at least one member of the city council was strongly opposed to the proposed use of the undeveloped land. The city council subsequently approved an ordinance that changed Nasierowki's zoning classification from "general business" to "office development," effectively halting Nasierowski's efforts to develop the property. *Id.* We held that "Nasierowski had a property interest in the old zoning

---

[5]Defendants argue that the building permits were properly denied because the plaintiffs had failed to fulfill one of the conditions for granting the permit--namely, building a costly fence on one end of the property. However, as Judge Bell pointed out below, "the facts make it clear that the building of the fence by [p]laintiffs would have been a futile act--what the Sixth Circuit has referred to as 'a waste of time and money. . . . The [d]efendants had already concluded that the building permits could not issue due to the ineffective site plan ordinance." *Buckeye Cmty. Hope Found.*, 970 F. Supp. at 1309 n. 21 (quoting *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1362 (6th Cir. 1992)) (citations omitted); *see also* J.A. at 1269 (testimony of Mr. Boone who stated that work on the fence did not begin "because it became pretty obvious that we are in a fight and . . . we don't have the funds to put up a $70,000 fence.").

did not have a legitimate claim of entitlement to the approval of their site plan and to the building permits. In *Silver*, a property owner alleged that the township board's denial of a conditional zoning certificate violated substantive due process. 966 F.2d at 1033. We held that because the board had discretion to grant a conditional zoning certificate, the plaintiff "possessed neither a legitimate claim of entitlement to the zoning certificate nor a justifiable expectation that the [b]oard would issue the certificate." *Id.* at 1036. In *Triomphe*, property owners brought suit against city council members alleging that the council's denial of a special use permit violated substantive due process. Relying on our decision in *Silver*, we held that since the city council had discretion to grant or deny plaintiffs' special use permit, the plaintiffs did not have a legitimate claim of entitlement to the permit. 49 F.3d at 203-04. In the case at bar, defendants argue that since site plan approval is discretionary, plaintiffs do not have a legitimate claim of entitlement to the approval of the site plan and therefore do not have a constitutionally protected property interest.

Defendants' reliance on *Silver* and *Triomphe* is misplaced for two reasons. First, in both of those cases, the property owners faced an obstacle not present in the case at bar: the proposed use of their property did not comport with the existing zoning regulations. Accordingly, in *Silver*, the plaintiff sought a special use permit, and in *Triomphe*, the plaintiffs sought a conditional zoning certificate. In contrast, "the [p]laintiffs are not seeking to change a reasonable zoning restriction, instead they are challenging . . . whether they themselves are allowed to enjoy the rights created by an already-existing zoning scheme." *Buckeye Cmty. Hope Found.*, 970 F.Supp. at 1314. Second, the alleged property interest at stake in both *Silver* and *Triomphe* arose from the failure of the decision-making bodies to approve plaintiffs' proposed use for their respective properties. However, in the case at bar, the City Council actually approved plaintiffs' site plan after having concluded that the site plan conformed with the existing zoning regulations. Thus, the property interest

On May 6, 1998, the Ohio Supreme Court, upon a motion for reconsideration filed by the plaintiffs, again ruled on the issue of whether the defendants use of a referendum to reject plaintiffs' site plan violated the Ohio Constitution. The City Charter of Cuyahoga Falls provides that voters may exercise powers of referendum on any ordinance passed by the City Council. J.A. at 129. However, Article II, Section 1f of the Ohio Constitution provides that "The initiative and referendum powers are hereby reserved to the people of each municipality on all questions which such municipalities may now or hereafter be authorized by law to control by *legislative* action . . . ." Ohio CONST. art. II, § 1f. (emphasis added). The Ohio Supreme Court held that the action taken by the Cuyahoga City Council was clearly administrative and not legislative in nature since it merely approved the Planning Commission's application of existing zoning regulations to plaintiffs' site plan. *See Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 697 N.E. 3d 181, 186 (Ohio 1998). Accordingly, the Ohio Supreme Court found that the referendum as applied to the ordinance approving the plaintiffs' site plan violated Ohio's constitution. *Id.*

Subsequent to the Ohio Supreme Court's decision, defendants again filed motions for summary judgment in federal court. The case was reassigned to Judge Dan Polster on September 8, 1998, after Judge Bell's retirement. On November 29, 1999, Judge Polster issued an order granting the defendants' motions for summary judgment and dismissed plaintiffs' equal protection, Fair Housing Act, and substantive due process claims.

## II.  LEGAL ANALYSIS

### A.  Standard of Review

This Court reviews a district court's order granting summary judgment *de novo*. *See Richardson v. Township of Brady*, 218 F.3d 508, 512 (6th Cir. 2000). Summary judgment is appropriate if a party who has the burden of proof

at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed. 2d 265 (1986). On appeal, we must construe the evidence, and all inferences to be drawn from it, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986).

## B.  Equal Protection

Plaintiffs argue that defendants violated the Equal Protection Clause of the Fourteenth Amendment when they improperly gave effect to the racial bias of their citizens by allowing a referendum to stay the effectiveness of plaintiffs' City Council-approved  site plan.  Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265,  97 S. Ct. 555, 563, 50 L. Ed. 2d 450 (1977). Plaintiffs do not have to show that the challenged action rested solely on racially discriminatory purposes.  As the Supreme Court stated in *Arlington*:

> Rarely can it be said that a legislative or administrative body operating under a broad mandate made a decision motivated *solely* by a single concern, or even that  a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is proof that a discriminatory purpose has been a *motivating factor* in the decision, this judicial deference is no longer justified.

*Id.* (emphasis added).

to the clear dictates of the Fair Housing Act. Accordingly, there is a genuine issue of material fact as to whether the defendants gave effect to the anti-family bias of its citizens by staying the site plan ordinance.

In sum, the district court erred in granting summary judgment on plaintiffs' Fair Housing Act claims since there are genuine issues of material fact concerning defendants liability under the FHA which should be resolved by a jury.

## D.  Substantive Due Process

Plaintiffs contend that the defendants' use of a referendum to deny the effectiveness of their  site plan deprived them of substantive due process.  In *Pearson v. City of Grand Blanc*, the Sixth Circuit defined substantive due process as "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed . . . ." 961 F.2d 1211, 1216 (6th Cir. 1992) (quoting Comment, *Developments in the Law--The Constitution and the Family*, 93 HARV L. REV. 1156, 1166 (1980)).  Substantive due process  involves the "right not to be subject to 'arbitrary or capricious' action by a state either by legislative or administrative action . . . ." *Id.* at 1217.

In order "[t]o establish a violation of substantive due process,  a plaintiff must first establish the existence of a constitutionally protected property or liberty interest." *Silver v. Franklin Township, Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992).  "An abstract need or unilateral expectation does not suffice to create a property interest; rather, a person must 'have a legitimate claim of entitlement.'" *Richardson*, 218 F.3d at 517  (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)).

Defendants rely heavily on this court's decisions in *Silver v. Franklin Township, Bd. of Zoning*, 966 F.2d 1031 (6th Cir. 1992) and *Triomphe Investors v. City of Northwood*, 49 F.3d 198 (6th Cir. 1995) to support their claim that the plaintiffs

circumstances present in this case that support a disparate impact analysis. For example, Cuyahoga Falls has *never* used the powers of referendum to reject a site plan ordinance before this case. An even more unusual circumstance is the fact that the Ohio Supreme Court found that the defendants' use of the referendum to reject plaintiffs' site plan violated the Ohio Constitution. *See Buckeye Cmty. Hope Found.,* 697 N.E. 2d at 186. Certainly, these circumstances are "highly unusual" for purposes of discriminatory impact analysis. In sum, we find that there are genuine issues of material fact as to whether defendants' actions had a disparate racial impact in violation of the FHA.

Plaintiffs also argue that defendants violated their rights under the FHA by giving effect to the anti-family biases of its citizens. *See* 42 U.S.C. § 3604(a) (making it unlawful to refuse to sell or rent or to "make unavailable or deny, a dwelling to any person because of . . . familial status"). An examination of the record reveals that a jury could reasonably conclude that public opposition to the project was also premised on fears that the large influx of children would change the character of the neighborhood. For example, at the March 4, 1996 City Council meeting, resident Larry Hart remarked that he did not feel a five foot fence is sufficient buffer between the retirement community and a complex with over 100 children. J.A. at 954. Lisa Rasko, another resident, commented that she was concerned about the educational quality in the school district; specifically, she worried about the class size with the influx of children. J.A. at 958. At the March 18, 1996 City Council meeting, one resident objected to the project because "[t]here will be . . . kids running around in our yards." J.A. at 949. Finally, James Kuznik, a tester for the Fair Housing Advocates Association, testified that members of the Citizens for the Preservation of Voting Rights--which mobilized support for the referendum--made statements dealing with children. J.A. at 1359-59. According to Kuznik, "[i]t was the children they were worried about." *Id.* These statements, viewed in the light most favorable to the plaintiffs, evidence an anti-family bias that runs contrary

Determining whether invidious discriminatory purpose was a motivating factor "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564; *see also Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) ("Municipal officials acting in their official capacity seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."); *Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970) ("If proof of a civil rights violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection."). Rather than engaging in such a sensitive factual inquiry, Judge Polster held that the defendants did not exhibit racial bias in denying plaintiffs the benefit of the City Council-approved site plan and withholding the building permits because the defendants were simply following the City Charter which required them to stay the effectiveness of any ordinance that is subject to a referendum. J.A at 65-66. This analysis begs the question of whether the public opposition to the housing project was animated by racial bias and whether City officials improperly gave effect to that racial bias by allowing the fate of the project to be decided by referendum.

"The Supreme Court has long held, in a variety of circumstances, that a governmental body may not escape liability under the Equal Protection Clause merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens." *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1131, 1224 (2d Cir. 1987). In *Hunter v. Erickson*, the Supreme Court held that the implementation of the majority will through referendum is not immune from judicial scrutiny since the "sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed." 393 U.S. 385, 392, 89 S.Ct. 557, 561, 21 L.Ed. 2d 616, 623 (1969); *see also City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448, 105

S.Ct. 3249, 3259, 87 L.Ed. 2d 313, 326 (1985) ("It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause . . . ."). Thus, if there is evidence that residents of Cuyahoga Falls were motivated, in part, by racial bias, the City can not give effect to that bias simply because its City Charter provides for referendum. *See Palmore v. Sidoti*, 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed. 2d 421, 426 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *Dailey*, 425 F.2d at 1039 ("[I]t is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals."). So, the question here is whether the plaintiffs produced sufficient evidence to raise a genuine issue of material fact as to whether the City officials gave effect to a referendum that was motivated, in part, by racial bias.

The Supreme Court in *Arlington Heights* articulated a multi-factored test for determining whether official action was motivated by discriminatory intent. Those factors include: (1) the racial impact of the decision; (2) the historical background of the decision, particularly where it reveals a series of official actions taken for invidious purposes; (3) the specific sequence of events leading up to the challenged decision--including departures from the normal procedural sequence; and (4) the legislative or administrative history-- especially where there are contemporary statements by members of the decisionmaking body, or minutes of its meetings. 429 U.S. at 266-68, 99 S.Ct. at 564-65.

With regard to the first prong--the racial impact of the challenged decision--Judge Polster acknowledged that the staying of the site plan ordinance disproportionately impacted African-Americans. J.A. at 68 ("There is no doubt that the repeal of the Ordinance approving development of a low income housing site had a disparate impact on racial minorities . . . ."). Plaintiffs' expert witness testified that if the 72 unit housing complex were not built, there would be a

showing of discriminatory intent. 782 F.2d at 574-75 (citing *Metro. Housing Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977)). The court enumerated three factors for determining whether conduct which produces a discriminatory effect violates the Fair Housing Act: (1) how strong is the plaintiffs' showing of discriminatory effect; (2) what is the defendants' interest in taking the action complained of; and (3) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing. *Id.* at 575 The first prong--the strength of the plaintiffs' showing of disparate impact-- supports plaintiffs' claim. Judge Polster acknowledged in his opinion below that there are sufficient facts in the record to conclude that the defendants' actions had a disproportionate impact on blacks. J.A. at 68 ("There is no doubt that the repeal of the Ordinance approving development of a low income housing site had a disparate impact on racial minorities . . . ."). The second prong-- the defendants' interest in taking the action complained of--also supports plaintiffs' disparate impact claim. In particular, we find dispositive the Ohio Supreme Court's decision concluding that the defendants' use of the referendum to deny plaintiffs' the benefit of their site plan violated Ohio's Constitution. *See Buckeye Cmty. Hope Found.*, 697 N.E. 2d at 186. Finally, with respect to the third prong, the plaintiffs did not seek to compel the defendants to affirmatively provide housing for members of minority groups; rather, they sought to restrain the defendants from interfering with the effectiveness of plaintiffs' lawfully approved site plan. Thus, all three factors support plaintiffs' disparate impact claim.

Despite this strong showing of disparate racial impact, plaintiffs cannot prevail unless there are "highly unusual circumstances" present in this case. *Arthur*, 782 F.2d at 575 ("[A]bsent highly unusual circumstances, the discriminatory effect of a referendum cannot establish a violation of the Fair Housing Act."). We find that there are "highly unusual"

these motivations may be quite relevant to the ultimate issue of the government officials' purposes.").

In sum, plaintiffs have produced sufficient evidence to raise a genuine issue of material fact as to whether (1) the opposition to the low-income housing project reflected racial bias; and (2) whether the defendants gave effect to that racial bias by allowing the referendum to stay the effectiveness of plaintiffs' City Council-approved site plan. Accordingly, the district court erred in dismissing plaintiffs' equal protection claim on summary judgment.

## C.  Fair Housing Act

The Fair Housing Act ("FHA"), 42 U.S.C. § § 3601, et seq. states that it is unlawful to " make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The standard for finding discriminatory intent is the same under the Fair Housing Act and the Equal Protection Clause of the Fourteenth Amendment. *See City of Parma*, 494 F.Supp at 1053. Plaintiffs claim that by staying the effectiveness of the site plan ordinance and consequently refusing to grant building permits pursuant to that ordinance, the City intentionally gave effect to the discriminatory anti-minority biases of its citizens and therefore violated § 3604(a) by making dwellings unavailable to potential home builders/buyers based on their race. As noted above, there are genuine issues of material fact as to whether the defendants gave effect to the racial bias of its citizens when they stayed the effectiveness of the site plan ordinance.

Even if plaintiffs fail to prove that defendants intended to discriminate on the basis of race, they also have a valid claim under the FHA on the theory that defendants' actions had a disparate impact based on race. In *Arthur v. City of Toledo*, the Sixth Circuit stated that at least under certain circumstances, a violation of the Fair Housing Act can be established by a showing of discriminatory effect without a

disproportionate impact on the black population with children since black income eligible households comprise a disproportionately high percentage of the multi-bedroom rental housing market. J.A. at 1309. The second prong--a history of discriminatory actions taken by the state-- is not a factor that cuts either way in this instance.

The third prong--departures from the normal procedural sequence--provides circumstantial evidence of racial discrimination. At the February 21, 1996 Planning Commission meeting, where members of the public voiced their strong opposition to the low-income housing project, Mrs. Hummel, a member of the Commission, remarked that she does not recall any other project where "there was this much scrutiny of a site plan." J.A. at 158. Louis Sharpe testified that there never has been an apartment complex in Cuyahoga Falls' history where a site plan had to face a referendum process except in the plaintiffs' case. J.A. at 1277. The Fourth Circuit in *Smith v. Town of Clarkton*, faced with a similar scenario, stated that "we view as significant the 'opinion poll,' conducted for the first time in the history of the small town of Clarkton immediately after expressions of racial opposition to the building of housing units surfaced. Such deviations from the procedural norm by governmental decisionmakers in such circumstances are suspect when they lead to results impacting more harshly on one race than on another." 682 F.2d at 1066. Similarly, in the case at bar, the fact that, prior to plaintiffs' project, the City of Cuyahoga Falls had *never* submitted a site plan to a referendum raises a genuine issue of material fact as to whether this deviation from the procedural norm was predicated on racial bias, especially in light of the disproportionate impact the decision had on blacks.

The fourth prong--the administrative history of the decision--also provides circumstantial evidence of racial bias. An examination of the record reveals that a jury could reasonably conclude that public opposition to the plaintiffs' project had a decidedly racial component. At the February 2,

1999 meeting of the Cuyahoga Planning Commission, Lee Minier expressed concerns about safety, commenting that "they know what kind of element is going to move in there." J.A. at 154. Gerry Priobonic, another resident, noted that "there will be a different class of people living there." *Id.* Harry Bridges expressed concerns about safety. *Id.* Susan Brady stated that she does not believe the area will be safe. According to her, "Cuyahoga Falls is downgrading itself." J.A. at 156. Several members of the public questioned Planning Director Sharpe about the height of a fence serving as a buffer between the project and neighboring complexes. Sharpe stated that the fence should not be higher than five feet, having to remind the citizens that the developer is trying to create a residential atmosphere not an institutional one. J.A. at 157. At the March 4, 1996 meeting of the City Council, Amy Bridges expressed concern about the extra crime and drugs that come with low-income housing. J.A. at 961.

Mayor Robart also voiced his opposition to the project. The Mayor seconded the concerns of those opposing the project, referring in his remarks to the crime problems associated with low-income housing projects. J.A. at 966. The Mayor also linked the project to the same type of "social engineering that brought us busing," which the Mayor considered to be an utter failure. *Id.* Further casting the debate over the project in a racial light, the Mayor referred to an article entitled "Stuck in the Ghetto" which discussed the problems with Section 8 housing. *Id.* Notably, the project at issue does not involve Section 8 vouchers; residents would have to pay the full rent. In any case, the Mayor declared that Cuyahoga Falls has done its part in supporting such projects. At the March 18, 1996 City Council meeting, Mayor Robart forthrightly acknowledged that the issue was not whether the project was properly zoned, but rather the issue was low-income housing. J.A. at 945. The Mayor stated "that people who spent a lot of money on their condominiums don't want people moving in their neighborhood that are going to be renting for $371." *Id.* Thus, the Mayor stated that City Council should not advocate

*United States v. City of Birmingham*, 727 F.2d 560, 564 (6th Cir. 1984). Furthermore, in *United States v. City of Parma*, the Sixth Circuit affirmed a lower court's invalidation of an ordinance requiring all proposals for low-income housing to be submitted to a voter referendum, finding that the ordinance was racially motivated. 661 F.2d 562, 578 (6th Cir. 1981).

We also find the Fourth Circuit's decision in *Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982), to be an instructive case on point. In *Smith*, a black resident of Clarkton, North Carolina sued the city alleging that the city, "bowing to pressure from public sentiment in Clarkton, ordered the town's withdrawal from the multi-municipality [low-income] housing authority, effectively blocking construction of . . . fifty units of housing." *Id.* at 1059. The Court noted that the evidence at trial established that "the actions of the defendants terminating the project resulted directly from the community's deep felt, intentional, invidious racial animus . . . ." *Id.* at 1065. As in the case at bar, there was evidence that the mayor echoed the concerns of the citizenry in a manner that highlighted the racial nature of the opposition. For instance, there was testimony to the effect that "Mayor Fort was concerned about an influx of 'undesirables.'" *Id.* The Court ultimately found discriminatory intent under the Fourteenth Amendment based on "evidence of . . . statements by citizens, including the defendants, which in a different context might not illustrate racial bigotry, but against the background of . . . considerable opposition to [the housing project] were interpreted by the trial court as 'camouflaged' racial expressions." *Id.* at 1066.

In light of these established principles, it is beyond peradventure that this court may properly view the statements made by residents of Cuyahoga Falls as additional information concerning the basis of the opposition to the proposed housing project. *See Contreras v. City of Chicago*, 119 F.3d 1286, 1292 (7th Cir. 1997) ("Of course, private citizens' motivations and government officials' knowledge of

The Sixth Circuit has, on several occasions, found an equal protection violation where city officials gave effect to the race-based opposition of citizens who sought to block low-income housing from infiltrating their predominantly white communities. In *United States v. City of Birmingham*, the district court ruled that a city was liable for its obstruction of a racially integrated housing project where the decision-making body's impedance of the project was a response to the racial animus of a majority of its virtually all-white community. 538 F.Supp. at 828. The court stated:

> The government need not prove that the [decision-making body] itself intended to discriminate on the basis of race in order to establish that the City acted with a racially discriminatory intent. In order to demonstrate a city's racially discriminatory intent, it is sufficient to show that the decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizens. Any other rule of law would permit a legislative body to place its official stamp of approval on private racial discrimination.

*Id*. (citing *United States v. City of Black Jack*, 508 F.2d 1179, 1185 n.3 (8th Cir. 1974)). The Sixth Circuit affirmed the district court's determination that the actions of the city had been racially motivated, citing the lower court's findings that unlawful racial motivation was properly inferred from

> the views expressed by a significant number of opponents of [the low-income housing project] (uttered both on the public record and within the hearing of those who testified at trial); a [decision-making body] that knowingly pursued policies that appeased those who expressed these bigoted views . . . [and] the decision to conduct an advisory referendum on the [low-income housing project] . . . .

anything that is clearly a step backwards and concluded that "we have to oppose this and we have to oppose it with vigor." *Id.*

Although a number of these statements could be interpreted as opposition to the lower economic status of the potential residents of the project, when viewed in the light most favorable to the plaintiffs, these statements can just as easily be seen as expressions of racial bias against blacks, especially given the fact that racial stereotypes prevalent in our society associate blacks with crime, drugs, and lower class status. *See* DAVID COLE, NO EQUAL JUSTICE: RACE AND CLASS IN THE AMERICAN CRIMINAL JUSTICE SYSTEM 34, 42 (1999) ("[T]he correlation of race and crime remains a stereotype, and most blacks will not conform to the stereotype. Even though blacks are arrested and convicted for a disproportionate amount of violent crime, it is nonetheless true that in any given year only about 2 percent of black citizens are arrested for committing any crime; the vast majority, or 98 percent, of black citizens are not even charged with crime."); Michael Sunnafrank & Norman E. Fontes, *General and Crime Related Racial Stereotypes and Influence on Juridic Decisions*, 17 Cornell J. Soc. Rel. 1, 10 (1983) (finding strong evidence in a sample of college students of crime- related racial stereotyping, such as perceiving blacks as more likely than whites to commit assault, and other violent crimes). Viewed in the light most favorable to plaintiffs, many of the statements made by Cuyahoga residents evidence a racial bias toward the prospect of a significant number of blacks moving into their community which is 98% white.

At bottom, the circumstances surrounding the opposition to the project, including the comments mentioned above, at least, raise a genuine issue of material fact as to whether the City, in rejecting the ordinance which approved the site plan, gave effect to the racial bias of its citizens.

Judge Polster's refusal to view the evidence contextually through an examination of the factors articulated in *Arlington Heights* stems from his application of the Sixth Circuit's decision in *Arthur v. City of Toledo*, 782 F.2d 565 (6th Cir. 1986). In *Arthur*, this court held that "absent a referendum that facially discriminates racially, or one where although facially neutral, the only possible rationale is racially motivated, a district court cannot inquire into the electorate's motivations in an equal protection clause context." *Id.* at 574.[2] It is undisputed that the referendum in this case was facially neutral and that there were other hypothetical justifications for the referendum apart from racial bias. However, the district court's reliance on *Arthur* is misplaced.

---

[2] Although we are bound by the Sixth Circuit's decision in *Arthur v. City of Toledo*, 782 F.2d 565 (6th Cir. 1986), it is by no means immune from our critique. The Court in *Arthur* relied on the Supreme Court's decision in *Washington v. Seattle School District No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed. 2d 896 (1982) in fashioning its unique test for evaluating equal protection challenges to referendums. 782 F.2d at 572 (6th Cir. 1986). An examination of the Supreme Court's decision in *Washington* reveals that its invalidation of an initiative that forbade busing for desegregation purposes would have failed *Arthur's* stringent test. The Sixth Circuit in *Arthur* stated that the only instance when a plaintiff may bring an equal protection challenge to a facially neutral referendum is when the "only possible rationale" animating the citizen's petition is racial bias. 782 F.2d at 574. However, in *Washington,* although the Supreme Court acknowledged "that voters were moved to support [the initiative] for 'a number of reasons,' so that 'it is impossible to ascertain all of those reasons or to determine the relative impact of those reasons upon the electorate'" the Court, based on its finding that the facially neutral initiative was effectively drawn for racial purposes, invalidated the initiative. *Washington*, 458 U.S. at 465, 102 S.Ct. at 3192. Aside from contravening Supreme Court caselaw, the decision in *Arthur* also suffers from the following flaw: It eviscerates the use of the Equal Protection Clause of the Fourteenth Amendment in the context of challenging referendums. A plaintiff will almost never be able to prove that racial bias was the "only possible motivation" behind a referendum that otherwise furthers racial discrimination. Moreover, if 95% of the proponents of a hypothetical referendum were motivated by racial bias, the rule in *Arthur* would nonetheless require courts to give effect to the overt racial prejudice of the majority.

To be precise, *Arthur's* holding is based on its conclusion that the *Arlington Height*'s "motivating factor" test does not apply to equal protection *challenges* to referendum elections. *Id.*[3] Thus, *Arthur's* holding is limited to equal protection challenges to referendum elections. In the case at bar, the plaintiffs are not challenging the referendum nor are they seeking to overturn the result of that referendum.[4] Rather, the plaintiffs seek to show that the defendants violated the Equal Protection Clause of the Fourteenth Amendment by giving effect to the racially biased opposition to their project. As Judge Bell pointed out in his opinion below:

> [T]he Court sees a distinction between inquiring into the thoughts of the voter at the voting box, and recognizing the stated motivations of citizens at public meetings and of those who organize and effectuate a petition drive. Where the former would involve the scrutiny of "people acting in a legislative capacity," the latter is simply an attempt to "gather additional information concerning the basis of opposition to the [ordinance]."

*Buckeye Cmty. Hope Found.,* 970 F.Supp at1318 (quoting *United States v. City of Birmingham*, 538 F.Supp. 819, 829 (E.D. Mich. 1982)). The holding in *Arthur* simply does not apply to the facts of this case.

---

[3] The court in *Arthur v. City of Toledo* made it clear that its concern centered on the propriety of overturning the results of facially neutral referendums. 782 F.2d 565, 573 (6th Cir. 1986) ("[T]his court will not lightly set aside the results of voter referendums.").

[4] Indeed, the Ohio Supreme Court has already accomplished that end by finding that the defendants' use of the referendum in this case violated the Ohio Constitution. *See Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls,* 697 N.E.2d 181, 186 (Ohio 1998) ("The passage by a city council of an ordinance approving a site plan for the development of land, pursuant to existing zoning and other applicable regulations . . . is not subject to referendum proceedings.").